FILED IN CHAMBERS
U.S.D.C. Rome

DEC 11 2007

JAMES N. HATTEN, Clerk
By: _____
            Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

BENNY and WANDA JACOBS, on
behalf of a class similarly
situated,

        Plaintiffs,

    v.

TEMPUR-PEDIC INTERNATIONAL,
INC., and TEMPUR-PEDIC NORTH
AMERICA, INC.,

        Defendants.

CIVIL ACTION

NO. 4:07-CV-02-RLV


O R D E R

This is an antitrust action, in which the plaintiffs allege

that the defendants are violating section 1 of the Sherman Act, 15

U.S.C. § 1.  Pending before the court are the defendants' motion to

dismiss Counts I and III of the complaint [Doc. No. 43], the

plaintiffs' motion to compel discovery [Doc. No. 44], the

defendants' motion for protective order [Doc. No. 46], and the

defendants' motion for leave to file a sur-reply brief in

opposition to the plaintiffs' motion to compel [Doc. No. 56].


I. FACTUAL BACKGROUND[1]

---

[1] On a motion to dismiss, the court accepts the allegations of
the complaint as being true and views them in a light most
favorable to the plaintiff.  Castro v. Secretary of Homeland
Security, 472 F.3d 1334 (11th Cir. 2006).  Consequently, the facts

In the early 1970's the National Aeronautic and Space Administration developed a visco-elastic memory foam and later released this technology to the public, Tempur-Pedic International, Inc., along with its parents and subsidiaries (hereinafter "TPX")[2] further developed this foam technology and introduced its own version of the foam in 1991 for home and medical use.  Today, TPX manufactures and sells a variety of products made from this foam, including premium foam mattresses.

Tempur-Pedic mattresses are sold at "full prices" because TPX requires distributors to agree to adhere to a minimum resale price set by TPX and not to discount the price.  In addition to distributing its mattresses through third-party distributors, TPX also sells mattresses directly to the public at the same prices it has agreed with its distributors to charge.

On November 7, 2005, the plaintiffs purchased a Tempur-Pedic mattress from a TPX distributor in Rome, Georgia, paying $2793.97, plus tax, for the mattress.  The plaintiffs allege that this price

set out are drawn from the plaintiffs' complaint.

[2] The defendants note that even though they are separate legal entities, the plaintiffs refer to them in the complaint as the single entity "TPX."  However, they, and the court, will accept the characterization of the defendants as a single entity for purposes of the pending motion.

2

is artificially inflated because of agreements entered into between TPX and its distributors that allow TPX to set the prices at which the distributors must sell Tempur-Pedic mattresses. Consistent with these resale pricing agreements, Tempur-Pedic distributors often advertise that they sell at "lowest factory authorized pricing" or at the "Lowest Possible Price."

According to the complaint, these agreements between TPX and its distributors result in there being virtually no price competition among the retailers and dealers in the sale of Tempur-Pedic mattresses. Consistent with these minimum resale pricing agreements, the actual retail sales prices of Tempur-Pedic mattresses vary little nationally, whether sold over the internet or through brick-and-mortar retailers.

## II. LEGAL DISCUSSION

By previous order, this court dismissed Counts II and III of the plaintiffs' complaint to the extent that they purported to state causes of action for horizontal price-fixing. The defendants now seek dismissal of Counts I and III to the extent that they purport to state causes of action for vertical price-fixing. The basis of the defendants' motion is the recent case of Leegin Creative Leather Products, Inc. v. PSKS, ____ U.S. ____, 127 S.Ct.

3

2705 (2007), in which the Supreme Court held that vertical minimum resale price agreements were no longer per se unlawful but had to be analyzed under a rule of reason standard.   The plaintiffs counter that even though Count I may have alleged a per se violation, the complaint as a whole can still be read to allege an antitrust violation even under the rule of reason.[3]

Motions to dismiss are generally disfavored since they short circuit a plaintiff's case at a very early stage of the litigation. However, they also serve the useful function of ending non-meritorious cases before a defendant is subjected to possibly extensive discovery and litigation costs.   This is especially true in anti-trust litigation, and even more so when the anti-trust case seeks class action status.   The Supreme Court recognized this tension in another case decided just this year:

> Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to

---

[3] "Indeed, Counts I and III are based on the same illegal competitive conduct of TEMPUR-Pedic, *i.e.*, unlawful vertical price-fixing.   Plaintiffs included two separate counts in the Complaint because TEMPUR-Pedic's illegal conduct implicated two potentially applicable legal standards.   Count III adds explicit geographic and product market allegations--allegations which only potentially became relevant after the Supreme Court overruled the per se standard in *Leegin*." Plaintiffs' Opposition to Defendants' Motion to Dismiss Counts I & III of Plaintiffs Complaint at 3.

antitrust discovery can be expensive. As we indicated over 20 years ago in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." See also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (C.A.7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"). . . .

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management" . . . , given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, e.g., Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves"). . . . Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura [Pharmaceuticals, Inc. v. Broudo]*, 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps [Manor Drug Stores]*, *supra*, [421 U.S.] at 741, 95 S.Ct. 1917; alteration in *Dura*).

Bell Atlantic Corp. v. Twombly, ____ U.S. ____, ____, 127 S.Ct. 1955, 1967 (2007).

In *Twombly*, the Supreme Court specifically held that to survive a

motion to dismiss a plaintiff had to allege sufficient facts (taken

as true) that would show "plausible grounds" from which to infer an anti-trust violation.   It is with *Twombly* firmly in mind that the court considers the defendants' motion to dismiss in the instant case.

The plaintiffs are correct in stating that *Leegin* changed the standard for deciding a minimum resale price claim but did not change the standard for pleading a rule of reason violation. However, *Twombly* emphasized that a plaintiff's obligation to plead the plausible ground showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   Twombly, _____ U.S. at _____, 127 S.Ct. at 1965.

In Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004) (footnote omitted), the court stated the requirements for proving a rule of reason violation:

> Under Eleventh Circuit case, alleged Section One agreements analyzed under the Rule of Reason require a plaintiff "to prove (1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.

To prove an anticompetitive effect on the market, "the plaintiff may either prove that the defendants' behavior had an 'actual

6

detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.'  In order to prove the latter, the plaintiff must define the relevant market and establish that the defendants possessed power in that market." Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996), quoting FTC v. Indiana Federation of Dentists, 476 U.S. 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2019 (1986).  Thus, a plaintiff must allege either "actual harm to competition" or "potential for genuine adverse effects on competition." Id.  It is only the second method of alleging anticompetitive effect that the plaintiff must plead the relevant market.

With respect to "actual harm," the plaintiffs allege in their complaint that the prices that they and all putative class members have paid for the purchase of Tempur-Pedic mattresses "have been artificially elevated due to the conduct of TPX and its distributors in eliminating price competition for TPX mattresses." Complaint at ¶ 43.  The plaintiffs also allege that the defendants violated section 1 "by eliminating price competition in the sales of Tempur-Pedic mattresses." Complaint at ¶ 47. Additionally, the plaintiffs allege, "As a result of the unlawful agreements

identified herein, Tempur-Pedic has harmed the Plaintiffs and all putative class members by overcharging substantially for Tempur-Pedic mattresses."   Complaint at ¶ 49.

These allegations are precisely the kind of "labels and conclusions" and "formulaic recitation of the elements of a cause of action" that the Supreme Court condemned in *Twombly*.   After carefully analyzing the *factual* allegations in the plaintiffs' complaint, the court concludes that they are insufficient to make a plausible showing of actual harm.   Therefore, the court proceeds to the alternative method of alleging anticompetitive conduct.

To successfully allege "potential" anticompetitive effects, a plaintiff must allege a relevant market, since "competition occurs only in a market."   All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc., 135 F.3d 740,749 (11th Cir. 1998).   The Eleventh Circuit has cogently stated: "On a very simplistic level, antitrust law is concerned with abuses of power by private actors in the marketplace. Therefore, before we can reach the larger question of whether [a defendant] violated any of the antitrust laws, we must confront the threshold problem of defining the relevant market. Markets are defined in terms of two separate

8

dimensions: products and geography." Thompson v. Metropolitan
Multi-List, Inc., 934 F.2d 1566, 1572 (11th Cir. 1991).

> A "market" is any grouping of sales whose sellers, if
> unified by a monopolist or a hypothetical cartel, would
> have market power in dealing with any group of buyers.
> See Phillip Areeda & Herbert Hovenkamp, Antitrust Law, ¶
> 518.1b, at 534 (Supp.1993). . . . If the sales of other
> producers substantially constrain the price-increasing
> ability of the monopolist or hypothetical cartel, these
> other producers must be included in the market. Stated
> differently, a "market" is the group of sellers or
> producers who have the "actual or potential ability to
> deprive each other of significant levels of business."
> Thurman Indus., 875 F.2d at 1374. Market definition is
> crucial. Without a definition of the relevant market, it
> is impossible to determine market share.
>
> Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421
> (11th Cir. 1995).

Not surprisingly, the plaintiffs and defendants disagree on what
constitutes the "relevant market" in this case--both as to the
product and the geographical area.

The plaintiffs contend that the relevant geographical market
is the entire United States; the defendants counter that a much
narrowed geographical market is appropriate since the mattress is
substantially local in nature. The court need not resolve this
issue because the court concludes that the plaintiffs have failed
to allege facts regarding the appropriate product market.

The plaintiffs urge the court to conclude that the relevant product market is the "visco-elastic foam mattress market." The defendants argue that the relevant product market is simply the "mattress market." The court agrees with the defendants. The court's decision is counseled by United States v. E. I. du Pont de Nemours and Co., 351 U.S. 377, 396-97 76 S.Ct. 994, 1008 (1956), wherein the Supreme Court stated, "In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control."

In *du Pont*, the Court held that the relevant product was not simply cellophane (as urged by the United States) but, instead, was "flexible packaging materials," which also included glassine, foil, and paper. "We conclude that cellophane's interchangeability with the other materials mentioned suffices to make it a part of this flexible packaging material market." *Id*. at 400, 76 S.Ct. at 1010. Such interchangeability is key. *See, e.g.*, Maris Distributing Co. v. Anheuser-Busch, Inc., 302 F.2d 1207 (11th Cir. 2002) ("beer market" is not interchangeable with "beer distributorship market").

The defendants' visco-elastic foam mattresses may be very different from innerspring mattresses, but they are still a product on which people sleep. Aluminum foil is quite different from

10

cellophane, but both are flexible packaging materials.  The court concludes that the relevant market is the mattress market, and the plaintiffs have not alleged that the defendants' actions have had an effect on *that* market.

For the foregoing reasons, the court concludes that the plaintiffs' complaint does not allege facts that would show plausible grounds from which to infer an anti-trust violation. Consequently, the defendants' motion to dismiss Counts I and III [Doc. No. 43] is GRANTED.  The other pending motions are DISMISSED as moot.  Since the court has previously dismissed Count II, the clerk will enter judgment for the defendants, dismissing the plaintiffs' complaint with prejudice.

SO ORDERED, this ___11th___ day of December, 2007.


ROBERT L. VINING, JR.
Senior United States District Judge

11